| | |
|---|---|
| 39 | 679 |
| 39 | 688 |
| 39 | 679 |
| 45 | 770 |
| 46 | 63 |
| 48 | 250 |
| 39 | 679 |
| 68 | 302 |
| 39 | 679 |
| f81 | 546 |

C. M. HENDERSON & CO. v. GIBBS & ALLEN.—SAME v. CREAMER BROTHERS.

1. TRIAL — *Evidence — Finding — No Error.* The court below did not commit any material error either in the admission of evidence, or in its general finding upon the evidence.

2. SALE — *Fraud in Procurement — Rescission — Bona Fide Purchaser.* Where personal property is fraudulently procured by purchase from an innocent owner, and the fraudulent vendee afterward sells the property to an innocent and *bona fide* purchaser, except that the only consideration moving from the second purchaser to the fraudulent vendee is the payment or partial payment of a preëxisting debt due

Henderson v. Gibbs.

from the fraudulent vendee to the second purchaser, the original
owner may rescind the contract made by him with his fraudulent
vendee and recover the property from the second purchaser.

3. ———— *Right of Seller to Rescind — Condition of Subsequent Purchaser.*
Where personal property is fraudulently procured by purchase from
an innocent owner, and the fraudulent vendee afterward transfers
the property to some third person, the title passes from the original
owner, first to the fraudulent vendee and then to the third person,
subject only to the right of the original owner to rescind his, con-
tract with his fraudulent vendee and retake the property; and this
only when he places or leaves both his fraudulent vendee and the
second purchaser in the same condition they were in before their
respective purchases.

*Error from Lyon District Court.*

REPLEVIN.   The facts are briefly and substantially stated
in the opinion.

*Buck & Feighan,* for plaintiffs in error.

*Kellogg & Sedgwick,* for defendants in error.

The opinion of the court was delivered by

VALENTINE, J.:  On September 4, 1884, two actions of
replevin were commenced in the district court of Lyon county
against C. M. Henderson & Co. for the recovery of certain
goods, wares and merchandise, consisting principally of boots
and shoes.   One of such actions was commenced by Gibbs &
Allen, and the other by Creamer Bros.   The two actions in-
volved substantially the same questions, and, with the con-
sent of all the parties and the court, were tried together before
the court without a jury; and the court in each case found
generally in favor of the plaintiffs and against the defendants,
and rendered judgment for a return of the property to the
plaintiffs, respectively; or, in case a return could not be had,
then in favor of the plaintiffs, Gibbs & Allen, and against C.
M. Henderson & Co., for the sum of $457.98, and costs; and
in favor of the plaintiffs, Creamer Bros., and against C. M.
Henderson & Co., for the sum of $192.90, and costs.   These
judgments were rendered on January 17, 1887; and to reverse
the same, C. M. Henderson & Co., as plaintiffs in error, have

brought both cases to this court, and both have been submitted to us at the same time, and upon the same briefs and arguments.

The plaintiffs in error, defendants below, claim that the court below erred in the admission of evidence, and also in its general finding on the evidence. The facts of the case, stated briefly, are substantially as follows: Prior to April, 1882, Frank J. Doan was in the employment of C. M. Henderson & Co., plaintiffs in error, defendants below, who were then and still are wholesale dealers in boots and shoes in Chicago, Ill. In April, 1882, Doan and one Quetch commenced business on their own account as retail dealers in boots and shoes in Emporia, Kansas, under the firm-name of Quetch & Doan, C. M. Henderson & Co. furnishing all the capital. Quetch & Doan continued in business until September, 1883, when Quetch retired, leaving Doan alone to continue the business. On April 27, 1884, Doan purchased a lot of boots and shoes from Gibbs & Allen, defendants in error, plaintiffs below, who were then and still are manufacturers of boots and shoes at Grafton, Mass. These are a part of the goods now in controversy. On May 13, 1884, Doan purchased a lot of boots and shoes from Creamer Brothers, defendants in error, plaintiffs below, who were then and still are wholesale dealers in boots and shoes at Boston, Mass. These are the remainder of the goods in controversy. The principal questions litigated in the court below were whether these purchases by Doan from Gibbs & Allen and from Creamer Brothers were fraudulent or not on the part of Doan. The court below found in the affirmative. At the time of these purchases Doan was owing to C. M. Henderson & Co. about $9,000, and also owed several other persons, while his entire stock of goods, furniture and fixtures and all that he owned were not worth that amount. Yet upon inquiry concerning his financial condition by the agents respectively of Gibbs & Allen and Creamer Brothers, he not only failed to disclose his unsound financial condition to them, but in effect stated to them that his financial condition was good. He stated to the agent of Creamer

Brothers, among other things as follows: "I am all right financially; there is no incumbrance on my stock here; am in good shape, and buy goods of C. M. Henderson & Co., Hathaway, Soule & Harrington, Gibbs & Allen, and several others, and I shall discount the bill, that's all." Also the following, among other conversations, occurred between Creamer Brothers' agent and Doan, to wit: "I [the agent of Creamer Brothers,] told him [Doan,] that I heard the rumor that C. M. Henderson & Co., of Chicago, were backing him up; his answer was that all C. M. Henderson & Co. had to do with him was that he formerly traveled for them and he bought a good many goods from them; but farther than that, they had no more to do with him than I did. I then asked him if C. M. Henderson & Co. or anybody else had any chattel mortgages or liens of any kind on him; his answer was emphatically 'No;' I mean he spoke emphatically. I asked him if C. M. Henderson & Co. paid any of his bills or discounted any of his eastern purchases; his answer was 'No.' I told him, on his statement of what he told me, that we would make the goods and ship them to him on the 15th of July." These statements were, in all their substantial implications, false and misleading. Doan was not all right financially. He was not in good shape. He was in debt more than he was worth, he was hopelessly insolvent. He did not generally discount his bills. C. M. Henderson & Co. did have something to do with him. They had backed him up, and carried him in business ever since he started in business. He was then owing them more than he was worth. They had paid some of his bills and had discounted some of his eastern purchases; and he never could have done business without their aid. And further, although Doan purchased the goods from Gibbs & Allen on April 27, 1884, and although the goods were to be delivered to him by July 15, 1884, yet he requested that the bill for them should be dated September 1, 1884, and Gibbs & Allen's agent assented to this. This of course was for the purpose of postponing the day when the price for the goods would become due. We might further say that

prior to these transactions between Doan and Gibbs & Allen and Creamer Brothers, there had never been any dealings between them. On July 30, 1884, Doan gave a note and chattel mortgage to C. M. Henderson & Co. on his entire stock of goods for the sum of $9,000. On August 21, 1884, he sold his entire stock of goods, including his furniture and fixtures, to C. M. Henderson & Co. for the amount of his indebtedness to them. At that time he owed to them $9,066.63. Yet his entire stock of goods including his furniture and fixtures invoiced only $8,538.19. His goods alone invoiced only $7,659.21, and C. M. Henderson & Co. realized out of them $6,665.86. He also at the same time owed several other debts, amounting in the aggregate to about $2,283.45. On September 4, 1884, the plaintiffs, Gibbs & Allen and Creamer Brothers, brought this action.

We cannot say that the court below committed any material error either in the admission of evidence or in its general finding upon the evidence; and taking the case as it was tried in the court below, and as it has been presented here, it would be useless to discuss these matters any further than we have already discussed them. It is true that the evidence tending to show that the purchases made by Doan from the plaintiffs below were fraudulent, is not very strong, yet we cannot say that the court below erred in finding that they were fraudulent, and certainly no evidence was erroneously introduced that might reasonably have misled the trial court into making such finding. The finding was general. No special findings of any kind were made, nor were any special findings asked for. Doan was hopelessly insolvent, and he misled and deceived the agents of the plaintiffs below into selling to him the goods in controversy.

1. Trial by court; no error.

There is still another question in this case, however, of much more importance than any of the foregoing questions, and that question is this: Where personal property is fraudulently procured by purchase from an innocent owner, and the fraudulent vendee afterward sells the property to an innocent and *bona fide* purchaser, except that the only consideration moving from the

second purchaser to the fraudulent vendee is the payment or partial payment of a preëxisting debt due from the fraudulent vendee to the second purchaser, may the original owner treat the original contract made by him with his fraudulent vendee as void, or rescind the same, and recover the property from the second purchaser? Upon this question there seems to be some conflict of authority; and yet the great weight of authority seems to be in favor of an affirmative answer to the question. Upon the affirmative of this question, see the following among other authorities; *Sargent v. Sturm,* 23 Cal. 359; same case, 83 Am. Dec. 118, and note; *Root v. French,* 13 Wend. 570; same case, 28 Am. Dec. 482, and note; *Barnard v. Campbell,* 58 N. Y. 73; same case, 17 Am. Rep. 208; *Stevens v. Brennan,* 79 N. Y. 254; *Thurston v. Blanchard,* 33 Am. Dec., note, 704, 705; *Poor v. Woodburn,* 25 Vt. 234; *Pope v. Pope,* 40 Miss. 516; *McLeod v. National Bank,* 42 Miss. 99; *Ratcliffe v. Sangston,* 18 Md. 383; *Hyde v. Ellery,* 18 id. 496, 501; *Spira v. Hornthall,* 77 Ala. 137; *Linnard's Appeal,* (Pa.) 3 Atl. Rep. 840; *Bradley v. Obear,* 10 N. H. 477; *Farley v. Lincoln,* 51 id. 577; *Sleeper v. Davis,* (N. H.) 6 Atl. Rep. 201; *Johnson v. Peck,* 1 Woodb. & M. 334. See also 7 South. Law Rev. (N. S.) 549, 569; 15 Am. Law Rev. 363, 388; *Dickerson v. Tillinghast,* 25 Am. Dec. 528; *Williams v. Merle,* 25 id., note, 613; *Thompson v. Rose,* 41 id. 121; 1 Benj. Sales, (4th Am. ed.) 570; Newmark on Sales, § 205. See also *Ruth v. Ford,* 9 Kas. 26, 27.

Upon the negative of the question, see the following cases: *Shufeldt v. Pease,* 16 Wis. 659; *Butters v. Haughwout,* 42 Ill. 18. See also the following case, as tending to support the negative: *Lee v. Kimball,* 45 Me. 172.

We think it is true with regard to any negotiable instrument, that if it is transferred by the holder thereof, in a proper manner, before due, to an innocent purchaser, for value, the instrument will be taken by the innocent purchaser freed from all infirmities, whatever fraud may have intervened in the procuring of the instrument from the original maker or drawer, or from any prior owner thereof, and whatever may have been

*2. Sale of personal property; fraudulent vendee; rescission by vendor; innocent purchaser.*

the consideration moving from the innocent purchaser to the transferrer of the instrument, whether a preëxisting debt or something else. Also in the transfer of personal property other than a negotiable instrument, if the purchaser, at the time of the purchase or at any time before the original owner actually elects to treat the fraudulent contract as void or to rescind the same, in good faith pays or surrenders to the person from whom he makes the purchase anything of value as the consideration or part consideration for such property, his purchase will be good and he will hold the property, although his vendor might be the fraudulent vendee of some prior owner of the property. And it may even be admitted that where the consideration for the property is only a preëxisting debt, if the innocent second purchaser in connection therewith surrenders any written or other security of value, so that he cannot be placed or left by the original owner of the property in the same situation or condition in which he was placed before the purchase, or in other words *in statu quo*, provided the original owner should desire to retake the property, the innocent purchaser will be protected and will be allowed to hold the property. (*Spira v. Hornthall*, 77 Ala. 137; *Robinson v. Fairbanks*, 81 id. 132; *Robinson v. Levi*, 81 id. 134.) In all such cases the original owner would be left to his action for damages against his fraudulent vendee.

On the part of the plaintiffs below, defendants in error, it is claimed that when a sale of personal property is procured by the fraud of the vendee, no title to the property passes and the sale is absolutely void. Now while this case must be decided in favor of the plaintiffs below, defendants in error, and the same as though this claim of theirs were true, yet we do not wish to place our decision upon any such doctrine. We do not think that it is sound. In our opinion when a sale of personal property is procured by the fraud of the vendee, the title to the property passes to the vendee subject only to the right of the vendor to rescind the contract and to retake the property, provided also that he places or leaves the vendee *in statu quo*. Many authorities may be found which

speak of such fraudulent sales as void and say that no title passes; but we think they generally mean only that the vendor may, under the circumstances of the particular case, treat such sales as void and elect to retake the property as though no title had ever passed. We think that such sales are not absolutely void, but are only voidable at the election of the vendor, and then only when he places or leaves the vendee in the same condition as he was before, or in other words, *in statu quo.* (Bigelow on Fraud, 73; 1 Benj. Sales, 568, § 648; Newmark on Sales, § 200.) Mr. Newmark uses the following language:

"The tendency of the modern cases is to adopt a view based on a closer analysis of the fraudulent vendee's title, and which may have been suggested by the instance of a *prima facie* title afforded by markets overt, or by the inclination to treat the contracts of infants as voidable and not void; but it seems to have been more immediately derived from the analogy of real property, where a like distinction was maintained.

"The title of the fraudulent vendee had been assumed to be utterly void; but this view of the contract as entirely null implied that the vendee might take advantage of his own wrong and treat it as such; whereas it was merely voidable at the election of the vendor. The question arises, however, whether this means that the contract is void until ratified by the defrauded owner, or valid until rescinded. If the former be the case, and the title does not pass at the time of the sale upon delivery, it is asked when it does pass, and whether it remains forever in the clouds, or *in nubibus,* and what definite act is essential to pass it afterward. It has been considered not enough to say that the title passes or not, as the vendor pleases, since the very right of rescission implies the subsistence of the contract; for there can hardly be a revocation of a transfer which never took place, and there must have been a title for the owner to disaffirm, as well as a title to convey to the innocent purchaser. The conclusion is accordingly deemed irresistible that a fraudulent vendee of chattels, where there is an absolute and unqualified delivery with intent to transfer the property, acquires the title, though it be merely a naked, voidable, defeasible title, and that on a sale by such vendee the title passes to a *bona fide buyer.*" (Newmark on Sales, § 200.)

The foregoing doctrine also applies, *mutatis mutandis,* where

the fraudulent vendee has transferred the property to some innocent third person. In such a case the title passes from the original owner, first to the fraudulent vendee, and then to the third person, but such title is always defeasible if the original owner has the power to place the other parties *in statu quo*. In such a case the original owner may rescind his contract with his fraudulent vendee and repossess himself of the property if he places or leaves both his fraudulent vendee and the second purchaser *in statu quo*, but if he cannot so place or leave them *in statu quo*, then the second purchaser will hold the property under his purchase. But even with these views, which are liberal as toward the second purchaser, it must be held that where the second purchaser has taken the property only in payment or part payment of a preëxisting debt, and has not paid or parted with or surrendered anything of value in consideration therefor, he takes nothing but the fraudulent vendee's title, and the original owner may rescind his contract with his fraudulent vendee and retake the property. That is this case. We would also think that the equities in this case, or rather in these two cases, are with the plaintiffs below.

*3. Right of vendor to rescind; condition of fraudulent vendee and subsequent purchaser.*

The judgments of the court below in both cases will be affirmed.

All the Justices concurring.