ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY v. JOHN A. EATON AND THOMAS J. EATON, *Copartners as The Farmers' Bank, and The Midland Elevator Company.*

No. 459.    (559 Pac. 604.)

CARRIERS OF GOODS—*Bills of Lading—Subrogation.* A common carrier negligently issued bills of lading to B., thereby clothing him with evidence of the ownership of certain personal property, of which it knew that B. was wrongfully in possession. Afterward B. transferred the bills to C., the only consideration for the transfer being the surrender and cancelation by C. of a past-due note, of which B. was the maker and C. the payee. The carrier brought suit against C. to recover the proceeds of the goods obtained by C. upon the bills, claiming that it had been subrogated to the rights of the original owner of the goods. *Held,* that before the carrier could recover it must place C. in *statu quo.*

Error from Cowley district court; A. M. JACKSON, judge.    Opinion filed January 11, 1900.    Affirmed.

*A. A. Hurd, W. Littlefield,* and *O. J. Wood,* for plaintiff in error.

*J C. Pollock,* and *John A. Eaton,* for defendants in error.

The opinion of the court was delivered by

SCHOONOVER, J. : The Kellogg Milling Company, of Kellogg, Kan., made arrangements with the Cherryvale office of the Midland Elevator Company for the purchase of two car-loads of wheat at eighty-eight cents per bushel.    The milling company at the time had an order from J. P. Campbell & Co., a commission firm doing business at Kansas City and also at Memphis, Tenn., for two car-loads of flour.    In order to obtain the benefit of the milling-in-transit rate, the milling company instructed the elevator company to bill the wheat through to Memphis, stop at Kellogg to grind.    In pursuance of this arrangement, the Midland Elevator Company consigned two car-loads of wheat by the Atchison, Topeka & Santa Fe railroad to shipper's order, Memphis, Tenn., to notify J. P. Campbell & Co., and to stop at Kellogg to grind ; and at the same time drew a draft for $880, the agreed price of the wheat, on the milling company, care of Farmers' Bank, Winfield, Kan.    This draft with bills of lading attached was placed in a bank at Cherryvale, Kan., for collection, and was sent by such bank to the Winfield National Bank and by that bank presented to the Farmers' Bank, of Winfield, for payment.    Payment was refused and the draft was protested for non-payment.

The two car-loads of wheat arrived at Kellogg, and the agent of the railroad company at that point permitted the milling company to unload and take possession of the wheat without having first produced and surrendered the bills of lading therefor. The wheat was ground into flour, which was loaded into the cars and consigned to J. P. Campbell & Co., shipper's order, bills of lading being issued to the milling company. The milling company drew drafts on J. P. Campbell & Co. for the value of the flour and attached them to the bills of lading and deposited same in the Farmers' Bank for collection. The bank collected the drafts and credited the proceeds upon the account of the milling company. Within a very short time after these transactions the milling company was closed up by legal proceedings instituted against it by the Farmers' Bank and other parties, and it was found to be insolvent. Payment for the wheat not having been made to the Midland Elevator Company by the milling company, the elevator company made claim upon the railroad company, plaintiff in error in this action, for the value of the wheat, $880, and demanded payment, and the railroad afterward paid the amount of the claim in full. The railroad demanded payment of this amount from the Farmers' Bank, defendant in error herein. The bank refused payment, and the railroad company brought this action to recover the amount in the district court of Cowley county.

In its petition the plaintiff alleged that the Kellogg Milling Company

"transferred the said drafts with the bills of lading attached to the said defendant, the Farmers' Bank, for the purpose of paying a prior indebtedness of the said Kellogg Milling Company to the said Farmers' Bank, and the said defendant, the Farmers' Bank, received from the milling company the said drafts

with said bills of lading attached, without advancing or paying to said Kellogg Milling Company any money or other consideration therefor, and collected and received the money thereon, and has ever since retained the same and withheld from the said Midland Elevator Company, and from this plaintiff, said money, the proceeds of said flour."

Defendant answered, and alleged among other things "that it in good faith, and without knowledge of any of the transactions between the Kellogg Milling Company and the Midland Elevator Company, acquired the bills of lading covering the flour." The case was tried to the court and a jury and a general verdict returned for defendants. Special findings of fact were also returned by the jury, one of which was as follows:

"Ques. At the time the Kellogg Milling Company deposited with the defendant bank the drafts for the flour, with bills of lading attached thereto, did the defendant bank pay certain of the checks of the Kellogg Milling Company and surrender up and cancel the note due the bank, relying upon the moneys named in such drafts and the bills of lading issued by the plaintiff railroad company? Ans. Yes."

One of the questions exhaustively discussed in the briefs of counsel for both parties is, "Did the title to the wheat pass from the Midland elevator to the milling company. From the view we take of the case, this question is not material, but, without entering into an extended discussion of the question, we will say that, after an examination of the record, we are convinced that title did not pass. While the plaintiff alleged in its petition that the milling company never had any interest in the wheat nor right to possession save and except to grind the wheat for the Midland Elevator Company, it appears to have

adopted the theory at the trial of the cause that the title to the wheat was to pass to the milling company when it paid the drafts and took up the bills of lading. The case is argued upon this theory in the briefs of counsel for plaintiff in error, and it is from this standpoint that we will consider it.

It is not contended by the railroad company that its agent was not acting within the scope of his authority when he permitted the milling company to unload the wheat without having first surrendered the bills of lading. Such a contention, indeed, if well grounded, would be fatal to their case, since subrogation takes place only when payment is made because of a legal obligation resting upon a party who claims to be subrogated. If the agent was not acting within the scope of his authority no liability would attach to the railroad company and it would not, therefore, be subrogated if it made payment. To claim subrogation, therefore, is to acknowledge that the railroad company was negligent when it delivered the wheat without requiring the surrender of the bills of lading. Not only was the railroad company negligent in this respect, but it was also guilty of negligence in issuing the bills of lading to the milling company for the flour before the bills of lading for the wheat had been surrendered. The railroad company is not in a position to urge that it did not warrant title to the flour to be in the milling company by the mere fact that it issued such bills. The railroad company had full knowledge of the terms under which the wheat was shipped. It knew that the wheat was billed "shipper's order," and was not to be delivered until the bills of lading were presented and surrendered. It knew that the wheat was billed through under the milling-in-transit arrangement, and was to be unloaded by the milling

company and ground into flour, which was to be loaded into the same cars and shipped on to Memphis. When the railroad company issued bills of lading to the milling company upon the flour, it knew that it was clothing the milling company with evidence of ownership of the flour which was the product of the wheat which it had delivered to the milling company without having required the surrender of the bills of lading therefor, and if such bills were afterward transferred to a *bona fide* purchaser for value, the railroad company would be in no position to claim any rights as against such purchaser. If, therefore, the Farmers' Bank was a *bona fide* purchaser for value, its title would be good as against the railroad company. The only consideration given by the bank for the transfer of the drafts and bills of lading was the surrender and cancelation by the bank of a past-due note of which the milling company was the maker. In the case of *Henderson v. Gibbs*, 39 Kan. 679, 18 Pac. 926, our supreme court held :

" Where personal property is fraudulently procured by purchase from an innocent owner, and the fraudulent vendee afterward sells the property to an innocent and *bona fide* purchaser, except that the only consideration moving from the second purchaser to the fraudulent vendee is the payment or partial payment of a preexisting debt due from the fraudulent vendee to the second purchaser, the original owner may rescind the contract made by him with his fraudulent vendee and recover the property from the second purchaser."

Also :

" Where personal property is fraudulently procured by purchase from an innocent owner, and the fraudulent vendee afterward transfers the property to some third person, the title passes from the original owner, first to the fraudulent vendee and then to the third

person, subject only to the right of the original owner to rescind his contract with his fraudulent vendee and retake the property ; and this only when he places or leaves both his fraudulent vendee and the second purchaser in the same condition they were in before their respective purchases.''

While, therefore, a preexisting debt would be an insufficient consideration, the party claiming title against a purchaser must place him in *statu quo*.  In the case of a debt not evidenced by a writing no difficulty is encountered, since, if goods were retaken by a party upon rescission of his contract because of fraud, the debt would not be discharged and the debtor and creditor would be left in the same position as they were in before the transaction.  But in this case the consideration was a past-due promissory note given by the milling company to the bank, and, without attempting to decide whether the note itself would be a sufficient consideration, we do decide that the record shows that the railroad company did not attempt to place the parties in *statu quo*, and, we may add, that it is doubtful whether the railroad company could restore the parties to the same position that they were in before the transaction.  The bank held the note of the milling company which, according to the special finding of the jury, it surrendered up and canceled.  This note, being a written contract, imported a consideration ; it would be barred by the statute of limitations in five years, instead of three, as in the case of a contract not in writing, and doubtless there are other legal rights which exist in favor of the holder of a promissory note which might be enumerated.  The railroad company did not restore the bank to its legal rights under the note, and the judgment of the district court will therefore be affirmed.